# CHARLESTON.

WILLIAM JAMES' SONS CO. *v.* CROUCH AND MANKIN.

Submitted February 20, 1912. Decided October 7, 1913.

1. EVIDENCE—*Copy of Recorded Grant—Admissibility.*

    A copy of a grant of land by the Commonwealth of Virginia, certified by the auditor of this state or the register of the land office of Virginia, showing no seal of the commonwealth thereon, nor anything indicating that it had borne such seal, when recorded, is admissible as evidence of title to the land, upon the presumption that the original is under seal, arising from the recordation thereof and the recital in the *testimonium* clause that the governor had affixed the seal. (p. 795).

2. WILLS—*Probate—Admission to Record—Collateral Attack.*

    Admission to record, by the clerk of a county court of this state, of a copy of a will probated in another state, amounts to probate thereof which cannot be collaterally drawn in question nor set aside otherwise than in the manner prescribed by statute. (p. 797).

3.  Public Lands—*Entry of Indefinite Description—Effect—Subsequent Grant.*

An entry of land, general and indefinite in its prescription of the land claimed under it, and afterwards carried into survey and grant, relied upon as proof of an exception, from another grant, of land susceptible of inclusion by the description of the entry, but lying entirely outside of the lines of the survey and patent founded on the entry, may be treated by a jury as calling only for the land surveyed and granted and as having been deemed by the surveyor to be identical with the survey and merged therein and the land lying beyond the lines of the survey as not having been excepted. (p. 798).

4.  Grant of Public Land—*Survey.*

*Quaere,* whether, to except an entry not specifically excluded by a grant with reservations, authorized by the Act of June 22, 1788, the survey designating the entry must be produced. (p. 802).

Error to Circuit Court, Raleigh County.

Action by the William James' Sons Company against E. P. Crouch and another. Judgment for plaintiff, and defendants bring error .

*Affirmed.*

*Dillon & Nuckolls,* for plaintiffs in error.

*McCreery & Patterson,* and *T. N. Read,* for defendant in error.

Poffenbarger, President:

Having introduced no evidence except certified copies of a certain grant, the defendants in this action of ejectment demurred to the plaintiff's evidence, and the court, being of the opinion that the evidence was sufficient in law to sustain a verdict for the plaintiff, overruled the demurrer and rendered judgment for it upon the conditional verdict fixing the location and boundaries of the land.

In support of their demurrer, the plaintiffs in error charge defects in the paper title of the plaintiff and insufficiency of the evidence to prove the land in controversy lies within the territory the title papers purport to cover.

The title claimed by the plaintiff goes back to the Dewitt Clinton grant, dated February 17, 1796. To establish this

grant, the plaintiff produced a copy of the patent to Dewitt Clinton, certified by the auditor of the state. As so certified, the patent appeared to bear the seal of the Commonwealth of Virginia, but, in making the copy, a printed form was used on which the word "Seal" appeared, and it was not erased so as make the copy conform to the record. The fact is, as shown by agreement, that the record of this patent shows no seal. To prove this, the defendants produced another copy certified by the auditor, and also two others of different dates from the land office at Richmond, Virginia, showing none.

Construing the statute as not having required it, the Virginia registers of the land office did not record the seals as parts of the grants, and this custom having prevailed for more than 200 years, during which thousands of grants were made and recorded the courts of Virginia and Kentucky, once a part of Virginia, have given effect to this practical construction and admitted copies of patents from the Virginia land office as evidence of valid title, notwithstanding the failure thereof to show the seals. The two constructions of the statute which it is supposed the officers considered and the reasons which impelled them to accept the grammatical rather than the legal construction are fully set forth in *Hedden* v. *Overton,* 4 Bibb. 406, and *Coal & Iron Co.* v. *Coal & Iron Co.,* 101 Va. 723. The decision in *Hedden* v *Overton* was approved and followed in *Sneed* v. *Ward,* 5 Dana 187, and by the United States Circuit Court of Appeals in *Robinson* v. *Dewhurst,* 15 C. C. A. 466, an action of ejectment originating in the U. S. Circuit Court for the District of West Virginia and involving lands in this state. Although the statute seems to have required all grants by the commonwealth to be "entered of record at full length" by the register of the land office, Code of 1819, Vol. 1, Ch. 86, sec. 50, page 334, the registers deeming the seal to be no part of the grant, omitted it. Legally it is undoubtedly a part of the grant or patent and essential to its completion, the statute requiring such papers to be signed by the governor and sealed with the seal of the commonwealth, but in a narrow grammatical sense it is not a part of the patent, but only an appendage thereof. At least it was so regarded and treated, and, for that reason, it was not recorded. The adoption of this view was no doubt superinduced or impelled by the

impossibility of producing upon the record books a fac-simile of the state seal. The conclusion of the Virginia and Kentucky courts finds some support in the presumption in favor of the regularity of the acts of public officials. As certified, the patent itself declares the governor had caused the seal of the commonwealth to be affixed. The statutory provisions, regulating the acquisition of land by grant from the commonwealth, were specific and positive as to the requisite steps. The patents were prepared by the register of the land office. On them he endorsed that the party in whose favor the patent was made out had title to the land, and this endorsement was founded on the records of his office. The paper thus prepared and endorsed was delivered by him to the governor, whose duty it was to sign it and affix to it the seal of the commonwealth. After this, it became the duty of the register to record it, and he had no authority to record it without the signature of the governor and the seal of the commonwealth. The certified copy shows the patent in question was recorded, and presumptively the record thereof was made after the governor had subscribed his name to it and affixed the seal, for the register had no authority to record it until it was so signed and sealed. Certain copies of grants certified by the auditor of this state, put in evidence, show seals, as if they had been copied from the original patents, and are relied upon as contradicting the statement that the register did not record the seals, but these copies were no doubt made on the printed forms used by the auditor, bearing seals, and so carry on their faces the error found in the copy of the Clinton patent. The statement of fact is taken from the Virginia and Kentucky cases and is no doubt founded upon the result of actual investigation. The reasoning and conclusion of the Virginia and Kentucky courts are approved and adopted and the certified copy held to be admissible as evidence of title, notwithstanding its omission of the seal. The presumption upon which this ruling stands is recognized in most jurisdictions and generally applied under the circumstances disclosed here. 1 Taylor Ev., sec. 149; 25 A. & E. Enc. L. 78; 11 Ency. of Ev. 656.

The will of Oliver L. Phelps, probated in the surrogate's office of Ontario County, New York, on the 17th day of May,

1814, as constituting a link in the plaintiff's chain of title, was not proved in Raleigh County as an original will, but a copy thereof was admitted to record as an authenticated copy of the will as probated in Ontario County, New York, by the clerk of the county court of Raleigh county February 18, 1861. The copy was not authenticated in the manner prescribed by the state and federal statutes. The certificate of probate in Ontario County was not under seal, nor was the official character of the surrogate shown in the manner prescribed. Although the evidence of the probate of the will in New York was not sufficient to authorize probate of the copy in this state, it was admitted to record. Such admission was a judicial act. It was a sentence of probate, notwithstanding the error committed by the clerk in the acceptance of insufficient evidence. However erroneous and irregular, this probate cannot be ignored nor called in question otherwise than by direct attack upon it in, the manner provided by law. *Norvell* v. *Lessueur,* 33 Gratt. 222; *Kirby* v. *Kirby,* 84 Va. 627; *Robinson* v. *Allen et als,* 11 Gratt. 785; *Taylor* v. *Burnside,* 1 Gratt 165; *Woofter* v. *Matz,* 76 S. E. 131, 134; *West* v. *West,* 3 Rand. 373; *Vaughn* v. *Doe,* 1 Leigh 287; *Wills* v. *Spraggins,* 3 Gratt. 555; *Parker* v. *Brown,* 6 Gratt. 554. "After a will has been admitted to record, it cannot, with us, be controverted incidentally; as it frequently is in the English common law courts, and sometimes (through the intervention of a jury) in their court of chancery, in consequence of the want of a court of probate in relation to wills of real estate. The sentence of our courts of probate cannot be drawn in question, unless in an appellate forum, except in the mode prescribed by our statute of wills." *Malone* v. *Hobbs,* 1 Rob. 346. The action of the clerk in admitting to record a will or an authenticated copy of one probated in another state has the same effect as if admitted by the county court. Code ch. 77, sec. 26. To set aside the probate of a copy, the mode prescribed by sec. 25 of ch. 77 of the Code must be followed. *McVey* v. *Butcher,* 78 S. E. 691.

DeWitt Clinton conveyed his grant to one Oliver Phelps. The devisees of Phelps conveyed it to Andrew Kingsbury as treasurer of the state of Connecticut and his successors in office for the use and benefit of the schools. On May 12, 1818, Kings-

bury, as such treasurer, sold and conveyed it to Gideon Granger. The title of Granger was afterwards confirmed by a deed from Zechariah Seymour and James Smedley, trustees under the will of Oliver Phelps. Afterwards, Gideon Granger disposed of it to his descendants by his will. Later it was passed on to more remote descendants by the will of Francis Granger. There were also conveyances of undivided interests among the Grangers, and perhaps strangers were interested at various times, but all interests seem to have gotten back into the hands of Granger descendants. By a deed dated January 23, 1888, numerous persons by the name of Winthrop, Granger, Irving and Pierson conveyed the land to Azel Ford. The introduction of this deed was objected to on account of a lack of evidence to establish the pedigrees or interests of some of the grantors. The objection did not specify the extent of this alleged defect, and the brief limits it to two persons, Charlotte R. Pierson and Bessie C. Pierson. Presumptively, they are the Charlotte Ross Pierson and Bessie Chapin Rochester, mentioned in the will of John A. Granger. The latter is described in the deed as having lately borne the name of "Rochester," and a deposition taken for the purpose of another case and read in this one by agreement shows she was a granddaughter of John A. Granger. In view of the record of the title and this testimony, the objection is obviously untenable.

The Clinton grant is what is often called an "inclusive" one, or, more accurately, one reserving from its operation prior claims within its boundaries. It granted by metes and bounds 130,000 acres, but excepted in general terms prior claims amounting to 126,000 acres. Many of these were specifically located by the plaintiff in its proof, but there are two old entries, claiming in the aggregate 36,356.5 acres, both antedating the Clinton grant, as to which there is controversy. One of these was made by Andrew Reid and John Stewart, November 1, 1794, for 31,356.5 acres and the other by Andrew Reid, March 20, 1795, for 5,000 acres. Upon these two entries a survey was made and completed on the 7th day of April, 1796, calling for a combined acreage of 36,356.5 acres, the aggregate of the entries. On the 27th day of March, 1797, the land so surveyed was granted to Andrew Reid. The entries were very

general in their description of the land, and, according to the testimony of two surveyors, are susceptible of an interpretation making them include about three times the quantity of land called for by them. As so construed, two surveyors were of the opinion that they included the land in controversy in this action, but they are positive the survey and patent made under the entries do not include any portion thereof.

The entries were made prior to the date of the Clinton Grant which contains this provision: "But it is always to be understood that the survey upon which this grant is founded includes 126,000 acres of prior claims which have a preference by law to Warrants and Rights upon which this grant is founded, liberty is reserved that the same shall be firm and valid and may be carried into grant or grants, and this grant shall be no bar in either law or equity to the confirmation of the title or titles to the same as before mentioned and reserved, with its appurtenances." Part of these entries was never carried into grant, but, if they were excepted as prior claims from the Clinton grant, that grant conferred no title to them. The title thereto remained in the commonwealth. *Bryan* v. *Willard,* 21 W. Va. 65; *Patrick* v. *Dryden,* 10 W. Va. 387, 416; *Nichols* v. *Covey,* 4 Rand. 365. Under the statutory system of disposition of public lands, the entries were lodged with the surveyors as applications for the surveys, and were never transmitted to the register of the land office nor recorded therein. Surveys made upon entries and plats thereof were required to be transmitted to the register of the land office and recorded. Thereupon it became the duty of the register to prepare the patents for execution by the governor. The entry was the basis for the survey and the survey the basis of the patent. As the register of the land office did not make the survey, there was no occasion for recordation of the entries in his office. The entry was merged in the survey, and the survey in the patent. Both were mere preliminary steps to the execution of the patent, but they conferred rights in the nature of equities, determinable by the courts of equity, when the statutory proceeding in the courts of law by caveat was not adopted. The caveat was a remedy provided by statute for determination of controversies between claimants for patents to the same land, or concerning conflicts

of boundaries of entries and surveys. After the issuance of the patent, the remedy by caveat was not available, but fraudulent patentees of land in equity and conscience belonging to others were held to be trustees of the legal title for the benefit of the latter. These observations show the nature and office of the entry. It gave a claim upon the land, but it was an indefinite one. It was a mere memorandum to the surveyor, calling upon him for definite designation of the desired land by a survey. Not being a survey, it was necessarily indefinite and general, notwithstanding the requirement of the statute that the location should be made "so specially and precisely" as that others might be enabled, "with certainty, to locate other warrants from the adjacent residuum." In *Harper & Weston v. Baugh & Seguine,* 9 Gratt. 508, the validity of entries was a subject of inquiry, and the substance of that decision is that the entry may be indefinite, but is void if unreasonably so. It was observed that a surplus of a few acres ought not to vitiate the whole entry, but if the whole of the boundaries were described by sensible objects, so that there could be no reason for one to yield to or control the other, the entry could only be good for so much as would be covered in common by surveys for the proper quantity made upon each of the boundaries. But if the boundaries were so extensive that surveys might be made on different parts of the boundary without covering any land in common the entry would be good for none. Obviously, therefore, notwithstanding what is said as to the requirement of definiteness, the entries were nothing more than mere general indications of the location of the desired land, and were afterwards defined by the surveys. In this instance, the John Stuart entry was so defined in less than eighteen months after it was made, the Reid entry in about thirteen months. The date of the survey combining them was April 27, 1796. In February of the same year, the Clinton grant was issued, upon a survey made in May, 1795, less than a year prior thereto, about six months after the Stuart and Reid entry, about two months after the Reid entry, and nearly a year before the Reid survey. The men who made these surveys and entries, or their agents were upon the ground in the wilderness in which the lands were at the time, and they embodied in the surveys their knowledge thereof

72 W. Va.

and their understanding as to the descriptions of the two entries in question. Their work merged the entries in the survey, wherefore the jury could well have said the indefinite entries were intended to conform to the survey and therefore extended only to the limits thereof, which are shown not to include the land in controversy.

As this grant is founded upon entries made after June 2, 1788, it is suggested, but not decided, that, to claim the benefit of an entry, or show an exception thereof from a grant, under a general reservation, the survey on which the grant was made should be produced, showing designation of the entry thereon, for the act authorized grants only upon surveys, showing reservations of prior claims. It took no notice of entries merely lodged with surveyors, and was passed primarily, if not solely, to validate unauthorized surveys, then found in the land office and confer rights to patents founded on them.

The act reads as follows: "WHEREAS, Sundry surveys have been made in different parts of this commonwealth, which include in the general courses thereof, sundry smaller tracts of prior claimants, and which in the certificates granted by the surveyors of the respective counties are reserved to such claimants; and the governor or chief magistrate is not authorized by law to issue grants upon such certificates of surveys; for remedy whereof, 1. *Be it enacted by the General Assembly,* That it shall and may be lawful for the governor to issue grants with reservations of claims to lands included within such surveys, anything in any law to the contrary notwithstanding."

At the date of the Winthrop deed, some of the land originally conveyed to Clinton had been conveyed away to strangers. Accordingly, the Winthrop deed granted to Azel Ford only such as remained, describing it as follows: "All the rest and residue of the DeWitt Clinton grant of 130,000, which now belongs to the parties of the first part, or to which they have any title, legal or equitable." Asserting duty on the part of the plaintiff to show the location of the land sold, as a means of identifying and locating that remaining unsold, under the well settled rule requiring a claimant, under a deed containing exceptions, to locate the exceptions, the briefs for the plaintiffs in error charge failure of the plaintiff below in this respect. The

lands sold from the grant are not specifically located by the evidence, as were the prior claims excepted from the grant itself, but the testimony of a witness was introduced, showing his entire familiarity with the land and intimate knowledge thereof. He had been attorney and agent for the Grangers from the year 1870 to 1888, the date of their deed to Ford, and was thoroughly acquainted with the DeWitt Clinton grant. As attorney for the Grangers, he had knowledge of all their transfers and kept a list of the lands they had sold, and testified that he knew the tracts in controversy had never been conveyed by the Grangers. He had not only been their agent and attorney and kept a record of their sales of land, but had also abstracted their title, bringing it down to their deed to Ford. Thus qualified, he said he knew the tract of land in controversy had never been conveyed away by the Grangers. Under the ruling on this question made in the recent case of *Winding Gulf Colleries Co.* v. *Campbell,* not yet reported, this evidence was admissible and sufficient to show prima facie that the land in controversy is no part of that previously sold and conveyed.

Having thus examined all the criticisms of the plaintiff's title and proof, and found them untenable, and seeing no defects therein, we think the ruling upon the demurrer to the evidence was proper and accordingly affirm the judgment.

*Affirmed.*